UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

*********************************************

Plaintiff,

JANE DOE,                                                                 JURY TRIAL REQUESTED
v.

Defendant,

FRANKLIN PIERCE UNIVERSITY
*********************************************

## COMPLAINT

### I. INTRODUCTION

Jane Doe was a student in the Masters of Physician Assistant Studies ["MPAS"] Program at Franklin Pierce University ["FPU"]. Her professor for ten of her courses: made outrageously offensive comments in class related to female students' breasts and genitalia; touched his female students' breasts in class without consent; and denigrated in his class persons with disabilities, particularly disabilities resulting in body disfigurement, such as eating disorders. Ms. Doe's learning environment was rife with sexist, marginalizing commentary and touching by her professor, and the professor ultimately shamed Ms. Doe by repeatedly accusing her of having an eating disorder in front of her peers. FPU received multiple complaints about the professor's outrageous behavior, over the course of years, but FPU refused to intervene or comply with Title IX regulations for ending sexual harassment, resulting in harm and loss to Ms. Doe.

### II. PARTIES

1. The Plaintiff, Jane Doe, resides in Pembroke, Massachusetts.

2. Defendant, FPU, is a New Hampshire non-profit corporation with a principal office at 40 University Drive, Rindge, New Hampshire.

1

### III. JURISDICTION AND VENUE

3. This Court has original jurisdiction over Plaintiff's Title IX claim, arising from a federal question, pursuant to 28 U.S.C § 1331.

4. This Court, under 28 U.S.C § 1367, has supplemental jurisdiction over the Plaintiff's state law claims as they are related to the same case or controversy as the Plaintiff's Title IX claims.

5. Alternatively, this court has diversity jurisdiction over the Plaintiff's state law claims, under 28 § 1332, as the amount in controversy exceeds $75,000 and the parties are citizens of different states.

6. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

### IV. STATEMENT OF FACTS

**A. FPU's MPAS program is an intensive, small-group, program, involving medical clinician practice in class.**

7. FPU operates its MPAS program at its West Lebanon, New Hampshire campus.

8. Upon information and belief, FPU received, at all times relevant to this complaint, federal financial assistance.

9. FPU's MPAS program extends roughly two-and-a-half years, beginning in November and ending 27 months later (in February).

10. The program is rigorous and intensive; involving just approximately 20 students in a cohort who move together through coursework instructed by select professors.

11. One of the professors is Jeffrey Waldron, a former firefighter and Physician Assistant.

12. Mr. Waldron was employed as an Assistant Professor in the MPAS program in September 2019. Since that time, he has taught four cohorts of prospective Physician Assistants, including female students.

13. Mr. Waldron teaches approximately ten courses to a cohort, in addition to giving the cohort supplemental lectures.

14. MPAS students must generally maintain a B average to remain in the MPAS program, and Mr. Waldron has broad discretion in evaluating and grading students.

15. MPAS's curriculum naturally involves discussion of anatomy, and Mr. Waldron frequently instructed anatomy and physical examination techniques.

16. FPU's Discrimination and Harassment policy, promulgated in accordance with federal and state anti-discrimination law, prohibits "harassment" on the basis of sex, race, religion, and disability, and provides, in relevant part, that "sexual harassment" occurs when students are implicitly required to submit to unwelcome verbal or physical conduct of a sexual nature as a condition of remaining a student. The policy further defines "sexual harassment" as any unwelcome, sexual-in-nature conduct, including "comments, slurs, innuendos…jokes" and "touching," which "creates an intimidating, hostile or offensive environment in which to learn."

17. FPU also maintains a Title IX, formal sexual harassment grievance policy, applicable to FPU as a recipient of federal funding, which prohibits "sexual harassment" defined as "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity."

18. FPU's policies require all managers, supervisors, and faculty to promptly report allegations of sexual harassment to FPU's Director of Human Resources/Title IX Coordinator ["Director/Coordinator"], and to further refer any sexual harassment complainant to the Director/Coordinator, for investigation of allegations.

19. The policies note that employees who fail to make the report and referral to the Director/Coordinator face disciplinary action, up to and including dismissal.

20. The policies provide for prompt investigation of sexual harassment complaints with completion of investigation in a "timely manner." The policies set a guideline for investigation completion within <u>60 days of complaint filing</u>.

> **B.    Mr. Waldron exhibited hostility and discrimination in his classroom, based on disability, race, religion, and gender.**

21. Beginning from his first term (November 2019), Mr. Waldron made harassing and discriminatory comments during his instruction.

22. In his Medical Ethics and Behavioral Health classes, Mr. Waldron mocked mental health conditions. For example, he expressed that fibromyalgia was psychosomatic and did "not really exist" so as to deserve medical attention.

23. Mr. Waldron referred to Asian patients whom he had encountered as "Chins" (even where he had Asian students in his classroom). Mr. Waldron made similar derogatory "jokes" about Jews.

24. Mr. Waldron further demonstrated sex-based bias in his classroom. He pointed out a group of male students who were formerly emergency medical technicians and complimented their former work, but made no effort to acknowledge the work of his medical assistant students who were primarily female.

25. Mr. Waldron used sexist language in his instruction, for example, repeatedly referring to his male and female students as "the men and the girls."

26. Mr. Waldron required female students to adopt sex-based stereotypes in physical examination assessments. He required female students, role playing as patients, to flirt with male student examiners but to argue with and refuse to take direction from female student examiners.

27. These directives were both humiliating and harmful to female students' grades, as it was more difficult to demonstrate examination skill proficiency on hostile subjects.

28. Mr. Waldron would often target students in his class. For example, he targeted a female student who self-identified as a feminist, taunting and mocking her by making sexist comments.

29. Mr. Waldron's comments were often grossly offensive. In a gynecological class, he warned his male students: "don't marry a woman who can't cook or clean because one day her 'goods' won't be good."

30. Mr. Waldron also singled out female students who had larger breasts to make examples of them for his pleasure. For example, when discussing how to perform a cardiac examination, Mr. Waldron exclaimed " [Female student name] is a great example of how to do a cardio exam on someone with big boobs – guys you should try it on her."

31. Mr. Waldron also leered at female students who were required to dress in revealing clothing for the purpose of practicing examination techniques.

        **C.    FPU failed to address and resolve complaints about Waldron's behavior.**

32. In or around September 2020, after prolonged exposure to Mr. Waldron's offensive conduct, two female students independently complained to FPU.

33. Specifically reported was that Mr. Waldron:

    (a) called women in his class "girls";

    (b) encouraged students to adopt gender stereotypes in examination exercises;

    (c) lauded the past medical work of male students while ignoring the work of female students; and

    (d) advised his male students to marry women with "cooking and cleaning" skills so that they will be useful "when [their] 'goods' are not so good."

34. One of the students reported this conduct to MPAS program director, Dr. Priscilla Marsicovetere. The student explained in written report that the cited conduct (at ¶ 33) was but a sampling of the offensive conduct Mr. Waldron was exhibiting nearly every lecture.

35. The student advised the director that she had attempted to resolve her concerns directly with Mr. Waldron, but that he had only argued in defense of his sexism.

36. The student advised that, because of Mr. Waldron's resistance, she proceeded up the chain of authority to report Waldron's conduct to a senior MPAS faculty member, who also failed to resolve her concerns.

37. Nor did the faculty member report the student's allegations to FPU's Director/Coordinator, or refer her to the Director/Coordinator, consistent with FPU's sexual harassment policies. See ¶ 18, supra. Upon information and belief, the faculty member has not been disciplined for violating FPU's sexual harassment protocols.

38. Dr. Marsicovetere, however, did refer both the student's written report and the student to the Director/Coordinator, albeit not for approximately a month after the report was made.

39. In the interim, Dr. Marsicovetere met with Mr. Waldron to lightly discuss the student's report, though it contained allegations as serious as telling male students in the presence of female students that their wives vaginas will not be pleasurable over time.

40. Upon information and belief, Dr. Mariscovetere allowed Mr. Waldron to escape discipline by merely explaining that he did not "intend" to be sexist and that he would avoid saying "girls" in the future.

41. The complaining student subsequently met with Director/Coordinator Dawn Broussard, who conducted a minutes-long interview.

42. Notwithstanding that the student explained the gender stereotypical roles she was required to play in class, and that her medical professor was repeatedly making gynecological jokes, Ms. Broussard scrutinized the *student*, stating conflicting things such as "I don't think that is severe" and "are you sure that is right?"

43. After the interview, the student received no follow-up communication or any findings resulting from her complaint.

44. Upon information and belief, the complaint was swiftly dismissed and the matter secreted.

45. Afterward, Mr. Waldron announced sarcastically to his class (which included the two students who risked retaliation to report his sexist conduct), to the effect that he could no longer "say things" about women because "some people" found it offensive.

### D.     Unchecked by FPU, Mr. Waldron's behavior escalated to sexual assault.

46.    In a subsequent term, Mr. Waldron proceeded to, without consent, touch the breast of the student who had complained about his conduct to Dr. Marsicovetere and to Ms. Broussard.

47.    The touching occurred during his physical examination of the student before a class of other Physician Assistant students.

48.    Despite that seeking consent is a basic tenet of examination procedure, Mr. Waldron, with the student laying supine and wearing only a sports bra, touched the student between her breasts, under her breast, and on the side of her breast, all without first notifying of what he was going to do and asking for her consent.

49.    The incident left the student very uncomfortable, particularly where Mr. Waldron was continuing his pattern of making sexually offensive comments in class.

50.    However, because the student had received no report of any action taken as a result of her previous complaints, she did not again complain, this time about the nonconsensual touching of her breasts.  Based on her experience of being ignored and dismissed by multiple FPU staff and faculty, the student believed making such a report would be futile.

### E.     Mr. Waldron continued his pattern of offensive, sexual conduct, targeting a new student in a new cohort.

51.    Jane Doe matriculated into the MPAS program in November 2020, joining a new cohort for Mr. Waldron.

52.    Ms. Doe paid FPU in excess of $100,000 in tuition to participate in the MPAS program, and, in exchange for tuition and Ms. Doe's commitment to work cooperatively and diligently in the program, FPU promised to enforce policies for her safety and well-being in the program.

53.    Mr. Waldron continued his pattern of making sexually offensive comments during instruction of Ms. Doe's cohort.

7

54. For example, Mr. Waldron pointed out a female student in Doe's cohort, and consistent with his pattern, gratuitously announced that she had "pendulous breasts."

55. Mr. Waldron similarly pointed out a student and identified her as having "birthing hips" (a non-medical term).

56. Outrageously, in the context of a gynecological lesson, and speaking to a group of male students, Mr. Waldron identified individual female students in the class and, for each, <u>announced the speculum size that he thought the female student would need in undergoing gynecologic exam</u>.

57. During a biopsy exercise, in which students were taking punch biopsies from an orange, Mr. Waldron commented that a punched "biopsy" looked like a "butt plug."

58. During a suturing exercise, in which students were working with large "wounds" on bananas, Mr. Waldron commented, "they always say, size matters."

59. Mr. Waldron additionally, during his office hours, told Ms. Doe an unsolicited, irrelevant story about a donut maker who filled his donuts with his ejaculate.

60. Mr. Waldron further continued his pattern of leering at and touching female students without consent during examination exercises.

61. For example, Mr. Waldron unnecessarily attended Jane Doe's ultrasound class as an observer, not an instructor. At the class, female students were exposed from the breast line to the pubic bone, to allow for their examination.

62. Mr. Waldron lingered and leered at Ms. Doe while she was being examined. When Ms. Doe's examiner identified an anomaly in her reproductive organs, Mr. Waldron sneered suggestively, "we always knew you were different, [Jane]."

63. Mr. Waldron also touched Ms. Doe's breasts without consent. Demonstrating cardiac examination, Mr. Waldron touched Ms. Doe's breast, between her breasts, and the side of her breast,

all without obtaining consent in accordance with protocol, and just as he did with the previous complaining student.

### F. Mr. Waldron targeted and harassed Ms. Doe, perceiving that she had an eating disorder disability.

64. To Ms. Doe's cohort, Mr. Waldron frequently referenced women's body types and body types to which he was attracted and not attracted.

65. Mr. Waldron expressed particular disgust for obese body types, for example referring to obese patients as "a human couch," a "beached whale," and a "VW bug."

66. In the context of a lecture on obesity related to diabetes mellitus, Mr. Waldron opined that the only way to treat a diabetic, obese patient was "to hand him an automatic weapon" (implying euthanasia).

67. Mr. Waldron expressed particular contempt for patients with eating-disorder disability. In a lecture discussing such disorders, Mr. Waldron referred to the diagnosed as a "lost causes."

68. Ms. Doe had painful memories surrounding eating restrictions imposed on her as a child, and Waldron targeted and harassed her perceiving her to have an eating disorder.

69. Initially, Mr. Waldron only occasionally made comments when he caught Ms. Doe eating in class (which was permissible). For example, he would comment that Ms. Doe was "eating again."

70. Mr. Waldron progressed to commenting to this effect nearly every time he witnessed Ms. Doe eating, and he began to also refer to her "bulimia."

71. This pattern culminated in a public shaming of Ms. Doe during Mr. Waldron's lecture on eating disorders. As Mr. Waldron was introducing the topics of anorexia and bulimia, he dramatically paused and glared at Ms. Doe to direct the class's attention to her.

72. At the end of lecture the following day, Mr. Waldron, again, publicly confronted Ms. Doe, asking her before her peers whether the previous day's lecture "on bulimia", "hit home." Here, Ms.

Doe summoned the courage to confront her instructor, asking *him* whether in his medical opinion she had an eating disorder.

73. To have the last word in the matter, Mr. Waldron later that day marched to Ms. Doe's lunch table, leaned in close, and dramatically snickered at Ms. Doe eating her food before walking away, leaving her humiliated before her classmates.

### G. FPU refused to promptly respond to Ms. Doe's complaint regarding Mr. Waldron's conduct.

74. For approximately her first year in the MPAS program (November 2020 to September 2021), Ms. Doe attempted to endure Mr. Waldron. She did not report his behavior for fear of retaliation as he had significant control over her success in the MPAS program.

75. Mr. Waldron's conduct did, however, negatively impact Ms. Doe.

76. Ms. Doe became anxious when encountering Waldron both in and outside of the classroom. It was difficult for her to absorb and retain his instruction,

77. Waldron's harassment isolated Ms. Doe from extra-curricular activities. Ms. Doe was an active member of MPAS' student council, but she did not participate in meetings when Mr. Waldron was present for fear that he would antagonize her.

78. For mandatory MPAS activities, Ms. Doe actively avoided being left alone with Waldron. She took pains to be accompanied by another person when she might encounter him, and she changed her parking spot and manner of traversing the MPAS building to avoid contact with Waldron.

79. Ms. Doe removed herself from Mr. Waldron's classroom to eat, so that she would not be accosted for eating. When she knew it would be difficult to leave the classroom to eat, Ms. Doe force-fed herself prior to class, to avoid eating in class and risk of harassment.

80. When it was announced that students had to participate in an "on call" exercise wherein Mr. Waldron would call their private cell phones, Ms. Doe was so unnerved by the prospect of a surprise call from Waldron that she decided that she would not participate in the assignment.

10

81.     Ms. Doe suffered Mr. Waldron's harassing conduct from November 2020 through September 2021, until Mr. Waldron dramatically shamed her for her perceived eating disorder. This incident so disturbed Ms. Doe that she sought advice from FPU's Undergraduate Dean of Students as well as counseling through FPU's program for student counseling to manage her emotional distress.

82.     Both the Dean of Students and the counselor referred Ms. Doe to the process for filing a sexual harassment complaint with FPU.

83.     Ms. Doe was not alone. In or around the Fall of 2021, she and one more student complained to the Dean of Students about Waldron, bringing the total number of student complaints about Waldron to at least 4, in just approximately two years of employment at FPU.

84.     In November 2021, Ms. Doe met with FPU'S Assistant Director of Student Conduct and Community Standards, Hannah Monbleau, who took Ms. Doe's complaint. The complaint included the allegations of offensive conduct by Waldron which are included herein.

85.     As of the November 2021 complaint, Ms. Doe had several terms yet to complete before graduation from the MPAS program.

86.     Approximately a month later, Ms. Broussard, who had interviewed the complainant from the previous cohort, contacted Ms. Doe to discuss the complaint.

87.     Ms. Broussard again demonstrated bias against the complainant in the meeting. She asked, for example, "what did you do to cause [Mr. Waldron] to treat you this way?"

88.     Nevertheless, on or about February 2, 2022, Ms. Broussard notified Ms. Doe that FPU would be treating her complaint as a formal complaint of sexual harassment (under Title IX) and that the complaint would be referred to a third-party investigator for investigation in accordance with Title IX regulations.

89.     In February 2022, Ms. Doe met with the investigator to provide information and continue the Title IX process.

90. The investigator released a draft investigative report to Ms. Broussard on or about April 4, 2022. Under Title IX regulations, Ms. Doe was entitled to a copy of the report.

91. From April 2022 to June 2022, Ms. Broussard refused to forward the report to Ms. Doe. Ms. Doe emailed Ms. Broussard asking for the report on June 9, 2022, but received no response from Ms. Broussard.

92. On July 9, 2022, nearly 8 months since submitting her complaint, Ms. Doe again emailed Ms. Broussard seeking the report.

93. Ms. Broussard again refused to respond to Ms. Doe.

94. On August 25, 2022, Ms. Doe emailed Ms. Broussard, again asking for the report and advising that she had filed a complaint with the U.S. Department of Education because FPU had failed to release its investigation report.

95. This time, Ms. Broussard replied, stating "thank you for the update" but provided neither the report nor any other information.

96. Ms. Doe received no other response from FPU as to investigation of her complaint until October 28, 2022, or approximately one year from the date of her complaint.

97. On this date, FPU finally released to Ms. Doe and Mr. Waldron copies of the draft investigative report that it had been holding without basis or explanation for nearly seven months, despite the 60-day guideline for investigation completion. The report contained several witness statements that supported Ms. Doe's allegations.

98. In accordance with Title IX regulation, the parties were invited to respond to the draft investigative report with corrections and relevant additional submissions. Ms. Doe did so promptly, on November 18, 2022.

99. Though the neutral investigator advised Ms. Doe that she expected to incorporate the submissions and deliver a *final* investigative report to FPU within a matter of weeks from November

18, 2022, and though Ms. Doe was entitled to a copy of the final report, despite repeated requests of FPU for distribution of the final report, Ms. Doe heard nothing substantive from FPU about the investigation or the report until February 3, 2023. On this date, FPU only vaguely advised that it would be "moving forward to an administrative hearing" and that Ms. Doe would receive "more information …in the near future."

100. Ms. Doe responded by advising, again, that she was in need of the final investigative report to be prepared to proceed into hearing.

101. Ms. Doe did not receive the final investigative report until February 9, 2023.

102. Ms. Doe graduated from the MPAS program on February 25, 2023, and FPU did not contact her to schedule the Title IX hearing for her complaint until March 2, 2023, almost a year and a half after submission of the complaint and five days after her graduation.

103. FPU intentionally delayed its Title IX process, most notably by holding on to and refusing to disclose the initial investigation report for seven months, such that Ms. Doe would not be afforded a hearing or any relief from sex discrimination until after she graduated from the MPAS program (when she could no longer benefit from her sought relief).

104. Based on FPU's repeated failures to respond to direct inquiries by Ms. Doe, FPU's repeated delays and denials related to Ms. Doe's access to the investigation report, and the timing of FPU's attempt to schedule a hearing, coming only *after* Ms. Doe graduated from the program at issue, FPU knowingly and intentionally violated its duties under Title IX, to promptly and effectively remediate sex discrimination in its educational program. It intentionally delayed its Title IX process, to avoid disruptive changes to its MPAS faculty and allow sex discrimination in its program to continue, causing harm and loss to Ms. Doe.

V.     COUNTS

## COUNT ONE

## VIOLATION OF TITLE IX, 20 U.S.C. § 1681 *et seq.*
## SEXUAL HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT

105. Plaintiff re-alleges and incorporates by reference the allegations in previous paragraphs as if fully set forth herein.

106. Upon information and belief, at all times relevant to this action, FPU has received, and continues to receive, federal financial assistance.

107. FPU has subjected Plaintiff, Jane Doe, to a sexually hostile educational environment in violation of Title IX.

108. To prevail on a claim of sexually hostile educational environment under Title IX, a Plaintiff must show: (1) that he or she was subject to harassment that was severe, pervasive, and objectively offensive to the reasonable observer (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits; (3) the federal funded school knew of the harassment in its programs or activities; and (4) it was deliberately indifferent to the harassment such that its response (or lack thereof) was clearly unreasonable in light of the known circumstances. Porto v. Town of Tewksbury, 488 F.3d 67, 72–73 (1st Cir. 2007); see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274 (1998)(school liable for money damages in private litigation under Title IX for teacher/student sex harassment if school had actual knowledge of the misconduct and was deliberately indifferent).

109. Mr. Waldron's conduct was sufficiently severe, pervasive, and objectively offensive to the reasonable observer to violate Title IX. For example, Mr. Waldron's public comments about individual female students' sexual body parts were severe and humiliating and occurred repeatedly over time. Similarly, Mr. Waldron's public touching of women in intimate areas of their bodies without their consent, contrary to standard Physician Assistant practice, was severe and humiliating and occurred repeatedly over time.

14

110. The sexually hostile environment caused Ms. Doe anxiety and emotional distress, in addition to alienation from instruction, assignments, and extra-curricular activities.

111. FPU had actual notice of the hostile environment created by Mr. Waldron in the MPAS program, as several other students had complained of his conduct prior to Ms. Doe's detailed and corroborating complaint of his conduct.

112. FPU demonstrated deliberate indifference to its sexually hostile learning environment, by ignoring and dismissing student complaints about Waldron's conduct and by intentionally delaying its investigation and hearing process (required to be prompt and effective under Title IX) in Ms. Doe's case until after her graduation. FPU's delay in processing Ms. Doe's complaint was clearly unreasonable given: the history of complaints made against Mr. Waldron; Ms. Doe's repeated requests for processing of her complaint and access to information about FPU's investigation; and FPU's abject refusal to respond to and assist Ms. Doe.

113. Because of FPU's unlawful conduct, Ms. Doe has suffered and will continue to suffer harm, including humiliation, embarrassment, emotional distress, and mental anguish.

114. Ms. Doe is entitled to all legal and equitable remedies available for violations of Title IX, including injunctive relief, compensation for economic loss, attorneys' fees and costs, and other appropriate relief.

## COUNT TWO

**VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT**
**DISABILITY RELATED HARASSMENT – HOSTILE EDUCATIONAL ENVIRONMENT**

115. Plaintiff re-alleges and incorporates by reference the allegations in previous paragraphs as if fully set forth herein.

116. Upon information and belief, at all times relevant to this action, FPU has received, and continues to receive, federal financial assistance.

117. Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182, provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation....".

118. The Rehabilitation Act, 29 U.S.C § 794(a), states that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

119. The statutes apply to disability discrimination by graduate education programs that receive federal funding. See 42 U.S.C. § 12181(7)(J) and 29 U.S.C. § 794(b)(2)(A).

120. The statutes define "disability" to include being regarded as having a disability. See 42 U.S.C. § 12102 (1)(c) and 29 U.S.C § 705 (9)(b).

121. A student has a cause of action under the ADA and Section 504 for a hostile learning environment when harassment based on a student's disability has "the purpose or effect of unreasonably interfering with [the] individual's performance or [of] creating an intimidating, hostile, or offensive environment." Guckenberger v. Bos. Univ., 957 F. Supp. 306, 314 (D. Mass. 1997).

122. To state a cognizable claim for hostile learning environment harassment under the ADA and Rehabilitation Act, a plaintiff must allege: (1) that she is a member of a protected group, (2) that she has been subject to unwelcome harassment, (3) that the harassment is based on a protected characteristic, her disability, (4) that the harassment is sufficiently severe or pervasive that it alters the conditions of her education and creates an abusive educational environment, and (5) that there is a basis for institutional liability. Id.

123.   Mr. Waldron subjected Ms. Doe to unwelcome severe, pervasive, harassment due to his regarding her as having the disability of bulimia.  Mr. Waldron repeatedly humiliated and harassed Ms. Doe, such that she was forced to remove herself from his classroom and avoid her instructor.

124.   FPU refused to promptly and effectively respond to or remediate the harassment though several students reported Mr. Waldron's inappropriate behavior.

125.   Because of FPU's unlawful conduct, Ms. Doe has suffered and will continue to suffer harm, including humiliation, embarrassment, emotional distress, and mental anguish.

126.   Ms. Doe is entitled to all legal and equitable remedies available for violations of Title IX, including injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT THREE

### BREACH OF FIDUCIARY DUTY UNDER NEW HAMPSHIRE LAW

127.   Plaintiff re-alleges and incorporates by reference the allegations in previous paragraphs as if fully set forth herein.

128.   In the context of sexual harassment by faculty members, the relationship between a post-secondary institution and its students is a fiduciary one.  Schneider v. Plymouth State Coll., 144 N.H. 458, 462 (1999).  When a student enrolls in the institution, she becomes dependent on the institution for her education, thereby requiring it "to act in good faith and with due regard" for her interests.  Id. The relationship between students and those that teach them is built on a professional relationship of trust and deference, rarely seen outside the academic community.  Id.  As a result, this relationship gives rise to a fiduciary duty on behalf of the institution to create an environment in which the plaintiff can pursue her education free from sexual harassment by faculty members.  Id.

129.   Plaintiff was enrolled at FPU as a graduate student in the MPAS program.  FPU, a New Hampshire post-secondary educational institution, has a fiduciary relationship with the Plaintiff. Plaintiff was dependent on FPU for her education, and FPU owed her a duty to act in good faith and

17

with due regard for her interests.  FPU thus owed Plaintiff a fiduciary duty to create an environment in which they could pursue their education free from sexual <u>and</u> disability-related harassment by faculty members.

130.    FPU breached the fiduciary duty it owed to Ms. Doe, by tolerating, sexual harassment, disability-related harassment, and gender discrimination, and failing to take remedial action.  FPU failed to adopt and enforce practices and grievance procedures to effectively respond to faculty misconduct that would minimize the danger Ms. Doe would be exposed to sexual harassment by faculty members.

131.    FPU further failed to act in good faith and with due regard for the interests of the Plaintiff who entrusted FPU with her confidence.  FPU knew or should have known that it fostered a hostile academic environment that enabled Waldron to sexually and on the basis of perceived disability harass Ms. Doe.

132.    FPU knew that Mr. Waldron had a propensity for sexually harassing female students.  It nevertheless permitted Mr. Waldron to maintain employment and supervisory authority over Ms. Doe and other students harmed by his conduct.  FPU's conduct was wanton, malicious, and oppressive, and conducted with full knowledge of the law as evidenced by its detailed anti-harassment policies with which it refused to comport.  FPU exhibited reckless indifference to the foreseeable risks of harm.

133.    Because of FPU's breach of its fiduciary duty owed to Ms. Doe, Ms. Doe has suffered and will continue to suffer harm, including but not limited to humiliation, embarrassment, emotional distress, and mental anguish.  Ms. Doe suffered and continues to suffer injuries and damages for which FPU is liable under state law.

## COUNT FOUR

## BREACH OF CONTRACT UNDER NEW HAMPSHIRE LAW

134.	Plaintiff re-alleges and incorporates by reference the allegations in previous paragraphs as if fully set forth herein.

135.	The Plaintiff paid tuition to FPU and agreed to abide by its policies governing students' conduct.  In turn, FPU promised to provide Plaintiff full access to its educational program and to enforce its policies in place for her safety and well-being in the MPAS program.

136.	The relationship between the parties was contractual in nature.

137.	 FPU breached its contract with Ms. Doe, by failing to afford her full and equal access to its educational program, and by failing to adhere to its own policies for investigation of abuses by its faculty member.

138.	Ms. Doe suffered harm as a direct and proximate result of that breach.

139.	Ms. Doe's mental harm suffered is compensable where the harm was within the contemplation of the parties at the time of contract (when Ms. Doe enrolled and FPU accepted her tuition payment), and the harm suffered was a foreseeable result of FPU's failure to apply its policies for the benefit, protection, and safety of Ms. Doe.  See Guerin v. New Hampshire Cath. Charities, Inc., 120 N.H. 501, 506 (1980).

WHEREFORE, the Plaintiff respectfully prays that this Honorable Court:

 A. Schedule this matter for trial by jury, and after trial;

 B. Award the Plaintiff compensation for economic losses;

 C. Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience, mental anguish, and loss of enjoyment of life;

 D. Award enhanced compensatory damages;

 E. Order FPU to initiate and implement programs and policies that (i) remedy the gender discrimination, sexual and disability-related harassment, and hostile environment in the MPAS program; (ii) ensure prompt remedial action regarding all claims of gender discrimination, sexual and

disability-related harassment and hostile environment; and (iii) eliminate the continuing effects of the discriminatory practices described herein;

  F.  Award the Plaintiff her reasonable attorney's fees;

  G.  Award the Plaintiff interest and costs;

  H.  Award all other damages available to the Plaintiff at law, and

  I.  Award the Plaintiff such other relief as this court deems equitable and just.

              Respectfully submitted,

              JANE DOE,

              By her attorneys,

              BACKUS, MEYER & BRANCH, LLP

Date: June 28, 2023    By: /s/ Megan Douglass
              Megan Douglass #19501
              116 Lowell Street
              Manchester, NH 03104
              (603) 668-7272
              mdouglass@backusmeyer.com